Black v. Henderson May it please the Court, my name is Mary Drivage. I represent the appellants Robert Black et al. If the Court would like me to address your questions first, I would be happy to do so. Otherwise, I will begin my prepared remarks, and I would like to reserve five minutes of my time for rebuttal. This case involves the Special Delivery Unit in the San Francisco Postal Service. In January 1991, 40 older and disabled employees, as well as others in the Special Delivery Unit, were told that their jobs would be decentralized. They filed age, disability, race, national origin, sex, and retaliation claims. In 2002, summary judgment was granted on all claims after a tortured administrative process. This case involves the black-letter law that summary judgment should not be granted if there is material disputed facts established in the record. The plaintiffs established a prima facie case, and there are disputed issues of material fact, many of them. The motive is disputed. The Postal Service maintains that the changes were done for efficiency, and the appellees maintain that this was a pretext for discrimination. Could we narrow things just a little bit? You've alleged retaliation, discrimination on the basis of race, gender, age, and disability. As I read you, are you still maintaining all of those grounds, or have you waived any of those grounds? We have not waived any of those grounds, but the burden of the way of proving each of those claims is the same if you view the McDonnell-Douglas test. I understand. I did not see in your brief that you had pressed the retaliation race and gender claims, but seemed to have focused on the age and disability claims, in which case the retaliation race and gender claims would have been waived. Right. We did not intend to waive any of those claims. We went into more detail on the age claim, because at that point in time, there was an issue about whether or not there was direct evidence or circumstantial evidence of age, which we felt that the court had misapplied, the district court. And since the U.S. Supreme Court in Desert Palace v. Costa has unanimously made clear that circumstantial evidence is to be treated on the same level as direct evidence, and recently the Ninth Circuit in the Stigall decision made clear how that applies in this circuit. I think that we probably should have gone into more detail about the other claims, the race and national origin and sex discrimination. But I want to just briefly go through how we established the prima facie case on the age claim, because it does apply to the other claims. In this case, there were 23 of the appellees. There were over 40 at the time that the decision to decentralize was made in 1991. Do you agree that those who weren't are out? No, because the acts were continuing in nature, and under the Morgan case, the U.S. Supreme Court said earlier this year that when there's continuing acts of the same or similar nature, those are part and parcel. Now, these are subsequent acts, so they're clearly part of the case. I just guess I don't understand, because if it happens when you're less than 40, I just don't see how you are part of the protected class. I don't think that they were part of the protected class until they turned 40, but they turned 40 during the life of the exhaustion process. And so you'll note that they checked certain boxes based on what groups they believed that they were part of, and that those, the appropriate boxes to have checked changed over time as certain of them looked at this issue very carefully and said that because they met the requirement for establishing a disparate impact claim, in other words, 85% or over 80% of the group of special delivery messengers were over 40, that they were remanding on that aspect, even as to Dave Spector and others that were under 40. That was recognition of the fact that this group was singled out because of the high percentage of older and disabled people in it. And that was a question of fact that I believe that we answered by showing that these individuals were 38 at the time, and by the time the investigation was completed, they reached the age of 40. But even if those four people were excluded, that would not provide a satisfactory judgment as to the other 23 people. Now, the defendants' exhibits in and of themselves show that there was direct evidence that the supervisors told appellants the reason for the decentralization was to get rid of the older employees and replace them with younger employees. Now, that was the statement made by Johnson. Is that right? And it's Johnson who is a supervisor who was in the management, the high-level management meetings, and the Court refers to that. Okay. Is there any evidence that links Johnson to Beck and to the people who actually made the decision to disband this unit? I believe part of the depositions which are not in the record referred to conversations that were directly with Dallas Keck, the postmaster at the time. But what is in the record is the fact that Dallas Keck was in meetings with these supervisors and telling them what the plans were, and it's Johnson was a supervisor who was relaying what was going to happen in the latter part of 1990 to the individuals, some of whom were active in the union or were told that in their capacity as union representatives. So that if it is not considered to be direct evidence in that the decision-maker did not actually state it to the appellant, it is certainly pretty good circumstantial evidence that that was the reason the supervisors were told, and that the supervisors believed that they were going to make these changes and replace the employees with younger employees, and that's exactly what happened. The work was given to letter carriers who were not they were in their 20s, and the explanation was told repeatedly in the context of the dinosaur remarks, the remarks that you are too old to work here, you're lazy and good for nothing and we want to replace you. So whether it's viewed as direct evidence or as circumstantial evidence, I believe under the COSTA ruling, it clearly was sufficient to make that claim, at least for the people who were over 40 at the time the decision was made, that they should have survived summary judgment on the ADEA claim. And I have cites to the record, the government's record, that shows the extent to which people were aware of and directly heard Mr. Ennis Johnson relay what Dellis Hecht told him. Counsel, I don't think there's any doubt that Mr. Johnson said those things. Now, Mr. Johnson said that they were dinosaurs, that they were too old, but they weren't replaced in the sense that we would that we often see in a Title VII case in which somebody is fired because they get to a certain age and then their particular job is taken over by a younger person. Here we've eliminated the entire unit. These employees have been reassigned elsewhere within the postal service. And the duties that were handled by the central unit have now been decentralized. That's very different from sort of a standard I got fired and I got my place was taken by a much younger person kind of suit. Okay. It's true that they did not fill those vacancies with younger people. They rather dispersed them around and eliminated certain shifts so that many of the people who held those vacancies and those jobs were put in jobs. Remember, when you bid into the special delivery unit, you lose all of your seniority, so that if you were put into a different unit, you now are at the bottom of the totem pole. Weren't some of the class members placed into letter carrier responsibilities? Some of them were put into letter carrier responsibilities or gopher positions in which they were assigned a number of jobs. But if they're put into letter, you said that they were replaced by, for example, younger letter carriers. But some of the folks who are members of the class were themselves placed as letter carriers, in which presumably they might have had some portion of the prior responsibilities that were held by the special delivery unit. What the evidence showed is that only the younger people, the ones under 40, were for a short period of time given those special delivery messenger duties. And that is evidence of discrimination because they distinguished between the letter carriers who were over 40 and the ones that were younger. They were showing the discriminatory animus was based on their age. Furthermore, the people that were put into the letter carrier duties were they lost their seniority. So unless they were assigned specifically to the special delivery unit, they had to do whatever they were told to do. They had no bidding rights on the jobs that were more desirable. This caused a lot of problems because not only did they lose their shift, they lost their ability to get the shift deferential, which was more money. They lost their ability to get overtime. They lost their control over their weekends or days off that had been established through 25 years or 15 years of service. These people had substantial draconian effects as a result of this decision. And under McDonnell Douglas, there are a lot of cases that say that it's not simply that you lost your job and you're replaced by another person, but it's the whole panoply of the way in which discrimination works in the workplace, in which the work is assigned to other people. And that is done on a pretextual basis. They say, well, we think these people can do it faster. That wasn't shown to be true. In fact, the statistics show that there was a dramatic loss such that all of the major universities in the city of San Francisco, all of the major institutions, discontinued their contract with the Postal Service and sought other carriers. And we know from 1991 until now how much of that overnight business the Postal Service has lost. They are down to about 30 percent of the market share. This is a well-known fact. And it was caused by this decision to take out the knowledgeable people that had been doing that job competently. They were getting awards. You know, one of the best-run postal services in the country for overnight delivery was San Francisco. They had 97 percent on time rates. So you have to allow the case to go to the jury so we can present all the evidence of how it was that they made a decision that not only didn't make sense, but it was discriminatory and it was directed at the very people based on their age that should have been allowed to continue to do their job. There should have been the studies done that we requested early on that the EEOC was so angry that their orders were not being complied with that they issued in 1994 an order directing the Postal Service that they could not present any evidence that they had not presented. In fact, there is no evidence showing that this was a good decision or that it would satisfy any of the requirements in the disparate impact area that there was a valid business justification that was necessitated. So we have the statistical evidence, of course, that the Court acknowledges exists at page 0323, but doesn't take into consideration that the EEOC in 1992, when they remanded the case, relied on the fact that there were – there wasn't sufficient statistical finding. It did not need an expert evaluation because it was so clear. The standard deviation is 1.8. If you have over 0.5 percent of the workforce that you're looking at that is adversely affected in that – in this case, it's that 80-20 rule that we're all familiar with, then that's a statistical sufficient showing to presume that there's discrimination. And that's exactly what we have here. In the Defendant's Exhibit No. 63, there was an EEO investigation report for Al Chirkop, which is near – there's actually 28 of these investigative reports, and they all have the same evidence, where the Postal Service tries to show their view of the statistics. So there was statistical effort. There was statistical evidence and an effort to dispute the fact that this had an adverse impact on the older people. Just very briefly, there was a lot of evidence that this has – was an adverse employment action, and I could go through the page and line numbers of the Black, Borrella, Farabaugh, Foley, Gibbons, Huey, James, and so on, depositions in which they testified that they were trying to squeeze my hours because I was not full-time, I was giving demeaning tasks, cut out of – cutting out labels and stuff. They were given different schedules. They lost their wages because they were on a different shift. They had a lower salary because they were no longer allowed to work overtime. They were sent home on the pretext that there was no work. They were assigned demeaning duties. They were ridiculed. They were sent to the cafeteria. In one case, a couple of people were sent to the cafeteria for years to wait for work. And meanwhile, the special delivery work was piling up around their ears. Customers were calling and screaming that this is an abomination. These are important letters and documents which people around the world rely on, having overnight expressed the service that had been provided historically. And the Postal Service did not advertise to its customers that we've discontinued this because we think it's more cost-effective not to provide the service. Counsel, you're making a case that Mr. Keck has made a very bad business decision. Is it possible that he could have made a bad business decision without having made that decision on the basis of forbidden factors, that is that he did not make it on the basis of age, race, disability, and so forth? Well, that is the dispute, and that's why this is a mixed motive case. If I had proof that the only possible reason was the illegal factors, I would have brought a motion for summary judgment myself. But on this evidence, I couldn't. They obviously claim in his two-page declaration that's unsupported by any studies, any documents, he claims that he didn't have that motive. But we have a lot of evidence that it was motivated by age. Is it clear that it was Mr. Keck's decision? Yes, it is. Okay. So are the statements from Mr. Johnson to be attributed to Mr. Keck?  Yes, he came out of meetings in which he was relaying to the employees what was going to happen to them. Okay. But did Mr. Johnson say, Mr. Keck said, the reason we're going to do this is? I believe there are places in the record, in the depositions that were taken by Mr. Saltil, of the individual appellants, where some of them heard either directly from Mr. Keck or from Ennis Johnson that the information was conveyed to them by Mr. Keck. And certainly the EEOC decision of administrative judge Player talks about Mr. Keck's involvement in continuing to retaliate against these individuals that continues to this day. That case, although the EEOC decision was in the record, the case is still ongoing in the administrative process in spite of the fact that normally the facts are all to be put into one courtroom and heard at one time. That's the most efficient way really to handle problems is to have all the information and to make one decision. And that's what I would request the Court to do in this case. And I don't have time to go through, because it is factually complex, all of the Rehabilitation Act claims. Suffice it to say that the Postal Service admitted that at least three of the plaintiffs raised disability discrimination complaints in 1991, Mr. Kong, Mr. Specter, and Ms. Thomas. Those claims should have been allowed to proceed to a jury at a minimum. We also have the administrative judge's findings that many of the plaintiffs had disabilities and were not accommodated. So there is inconsistent evidence about whether or not the accommodations that were requested were actually provided. There's lots of information in the underlying EEO record on the retaliation part of the case. Counsel, if you are continuing to maintain that we're discriminating on the basis of retaliation, race, gender, age, and disability, among your group, you have some members of your class that are disabled and others that are not disabled. Is that correct? That's correct. You have some who are under 40 and some who are over 40. They're all over 40 as of 1982. As of now. You have some who are men and some who are women. None of the men are claiming sex discrimination. Oh, I understand that. But within this overall group that you claim was dismissed, we have some men and some women. Right. We have some who are minorities and some who are not minorities. That is true. And the sex and the national origin and race claims are slightly different because the evidence was events that happened subsequent to the decentralization. For example, when all of the women were taken out of the unit and treated differently than the men that are part of the special delivery unit. They were given worse jobs. They were stripped of their rights. That's part of your second suit that's still presently before the EEOC, right? We've got a retaliation claim that's still pending. No. I'm referring to the period 91 to 97. There's sex discrimination that occurred that is discussed in Sedalia Thomas's declaration that was not considered by the court, but it's also in the government's affidavits. For example, Georgette Gibbons' affidavit, which is Defendant's Exhibit Number 43, pages 0421 to 0429, where she discusses that nine messengers, all male, with less seniority, were allowed to remain messengers where the females were all accessed. And that is also described in Ms. Gibbons' deposition, Defendant's Exhibit 11. The Foley, Mr. Foley described how females were treated by the Postal Service in Defendant's Exhibit 10. Yvonne Smith's deposition, Defendant's Exhibit 23. And Sedalia Thomas's deposition, Defendant's Exhibit 26. And these are just the pages that the government put in the record. They are not the entire deposition, and they are not all of the evidence on sex discrimination, but certainly sufficient evidence to show that there was a disputed issue of fact as to how these women were treated during this period of time, even if it stops at 1997. I just want to understand. Your claim is then that once the special delivery unit was dissolved, that the women employees of that unit were treated differently from the men on their reassignment. Is that correct? They didn't actually dissolve the unit until 1997. They decentralized it to four separate locations around the city. What's the answer to Judge Bivey's question? And he's correct with the caveat that it's a decentralization rather than a discontinuing. It's a technicality, but that's what occurred. And then there are. Thank you. I have two minutes. I'd like to reserve that for rebuttal. Actually, you're two over. Oh. Sorry. Mr. Salteel. I'd like to turn my attention to the last case. Hey, please, the Court. My name is Steven Salteel, and I represent the appellee, Postmaster General, in this case. The issues raised on this appeal are whether the district court properly granted summary judgment on the appellant's age discrimination claims and disability discrimination claims. Some of the appellants raised race, gender, retaliation claims, but they were not addressed in the plaintiff's briefs, and we submit that those claims are waived on appeal. And that would be consistent with this Court's holding in Greenwood against FAA at 28F3rd 971 at page 978. If I may, Your Honors, I'd like to clarify what the decentralization was. It was not a disillusion of the unit. Before January 1991, the special delivery messengers worked out of one centralized location in the southeast corner of the city. After January 1991, they were working out of four locations that were spread out throughout the city. In addition to these moves, two shifts, what were once two shifts, were consolidated into one shift, and some of the positions were eliminated. The remaining positions were put up for competitive bidding based on seniority. The appellants in this case, all the special delivery messengers were affected by the decentralization in different ways. They weren't all affected the same way. Of the appellants in this case, a majority of the largest group of the appellants, there are 20 of them, kept their jobs as special delivery messengers by bidding into one of the remaining positions at the four decentralized locations. And at page 25 of our answering brief, we've listed who those appellants are. Now, these individuals had the same job with the same pay. There's no evidence that any of these individuals, no evidence in the record, that any of these individuals had a lower salary as a result of the decentralization. They had the same job with the same duties as their testimony reveals, except they were at different locations. Is it clear, though, that some of them had fewer opportunities for overtime pay, and fewer of them had accommodations made to them that they had less desirable shifts? Well, the shifts, I believe, there were two shifts that was consolidated into one shift. With respect to overtime, it is clear that some of the appellants testified that they had fewer opportunities for overtime. There's no evidence that any of them had a lower salary in, say, 1992 or 1993 than they had in 1990 or 1989. That evidence is not in the record. A smaller group of the appellants, there are seven of them, worked reassigned to either letter carrier jobs or clerk jobs. As with the other group, these individuals did not suffer a cut in pay or a cut in benefits, and they were eventually called back to the unit, to the special delivery unit. The district court found that the appellants did not state an adverse employment action. One of the elements that they didn't fulfill for the prima facie case was an adverse employment action. And at best, these individuals experienced a shift change or a transfer to another location. And there is no evidence in the record that their reassignment was a disadvantage, a disadvantageous reassignment, or that there was a loss in opportunity or benefits. What was Ennis Johnson's position in the hierarchy? Ennis Johnson was the first-line supervisor of some of these appellants. So he was the he was their direct supervisor. And did he part of his job was to communicate with more senior management? Not directly to Mr. Keck, who was the postmaster of the city of San Francisco, who was several levels above. Has it ever been fleshed out what he meant by the remark, the upper management wanted the post office to bring in new blood? No, it hasn't. Mr. Johnson was no longer employed by the Postal Service at the time this case was going through discovery and being litigated. He never testified, as far as I'm aware, either in the administrative proceeding or Do we know whether he admits or denies these remarks? We don't, Your Honor, because he never testified and he never had the chance to admit or deny them. For the purpose of deciding whether the case was appropriately resolved, do we assume these remarks were made? Well, we have unrebutted allegations that they were made. And these allegations of his testimony came from the appellants who apparently heard Mr. Johnson say these items. However, it shouldn't change the result in this case. The first of the actual The employees say this was done for bad reasons. The post office comes back and says, no, this is part of a decentralization plan. It's done in a lot of other places. It's being done to make this particular service more efficient, et cetera, et cetera. And the plaintiffs come back with an affidavit that says here's a supervisor with some connection to senior management saying that the purpose of this was to get rid of old folks and inefficient folks and bring in young blood. But it's not in the record, though, Your Honor, that Mr. Johnson was relaying some message from Dallas Tech, the postmaster. Well, if we assume it to be true, what David Foley says he said was that the upper That, I believe, came from one of the declarations that was filed. Sir David Foley. Right. And again, we assume it to be true for these purposes. Well, I guess I should step back for a minute. Mr. Foley was also deposed in this case, and he testified about comments that Mr. Johnson gave in this regard in response to a question, well, what evidence do you have that anybody based any of these decisions on age? That is not a comment that he included in his deposition testimony. That was somewhat of an embellishment that came later in this declaration. And I would submit, Your Honor, that to the extent that it is inconsistent with his deposition testimony, that is merely an attempt to defeat summary judgment by creating an issue of fact. So the Foley affidavit postdates his deposition? Yes. The affidavit or the declaration was actually submitted after the opposition to the motion was due. And was he specifically asked at his deposition whether Johnson had made comments about upper management wanting to bring in Youngblood? I don't believe he was asked that question. He was asked what comments did Mr. Johnson make that led you to believe that this decision was based on age. And in response to that question, he didn't? He didn't say specifically that you were being replaced. The decision was being made so you all could be replaced by younger employees. That's an inference that they're trying to draw or speculation that they're making. The comments that were made were, and this is fairly consistent through all the appellant's testimony, were comments such as referring to them as, quote, old timers, unquote, or as representing the way work used to be done, or referring to them as, quote, dinosaurs, unquote. And outdated, lazy. That as well. That as well. And with respect to those comments in particular, they're not necessarily probative of age discrimination. I mean, this Court has found that similar comments were merely colloquialisms that were unrelated to age, such as the comment, old boy network, which this Court found not to be probative of age discrimination in Rose against Wells Fargo, or old business model, or Deadwood, which this Court found not to be probative of age discrimination in the Pottinger against Potlatch case. Even if these comments were or do reflect a discriminatory animus, there's no evidence in the record, and counsel made a lot of statements and stated a lot of facts, but some of these facts are just not in the record. There's no evidence in the record that ties these comments to the decision made by Dallas Keck. In fact, Mr. Keck testified through a declaration that he was the final decision maker. There's no dispute to that, that he didn't consult with the first-line supervisors in making this decision. And there's nothing to contradict that. And there's no evidence of bias on Mr. Keck's part. Counsel, the plaintiffs have alleged that part of the circumstantial case for proving discrimination here is that the dissolution of the SDU was pretextual. And again, part of the evidence for demonstrating that is how badly all of this has turned out. Does the government concede that the dissolution of the SDU was a bad idea? Not at all, Your Honor. And there is no evidence in the record that that's the case. It's just not in the record. Those type of ‑‑ I mean, counsel says it's well-known facts, but it's not in the record. There's no evidence in the record showing that this was a bad decision, that decentralization caused delays and a disruption of this service. Even if it did show that, however, that is not enough, we submit, to prove pretext and to make the ultimate showing that this decision was motivated by the age of these individuals. Counsel also made some references to the disparate impact claim. I'd like to address that briefly. The disparate impact claim here fails because there is no statistical analysis to support the claim that the decentralization had an adverse impact on an age‑protected class. The most striking illustration of the absence of this evidence is the appellant's answers to interrogatories that were propounded on this very issue, and that appears at the supplemental excerpts at pages 491 to 496. The evidence that appellants offer at this point is simply not a statistical analysis. First of all, the evidence that they point to in their opening brief, which is at pages 23 and 24, is evidence that is not in the record. Some of it appears to have been in the administrative record, but it's not in the record here. What they point to in their reply brief is a comment that's made in the EEOC's remand order when they remanded this administrative complaint back to the Postal Service to investigate, and it was simply a comment that the majority of the employees in this unit were over 40. Well, that's not a statistical analysis that shows that the people who were over 40 were adversely impacted by this decision. A statistical analysis is one that's based on reliable data. It has statistical significance, and it controls for various other variables. As Your Honor pointed out, these individuals were not replaced anyway. They were moved to different locations. The majority of them had the same jobs after decentralization. A small group of them had different jobs. With respect to the Rehabilitation Act claims, disability claims, counsel did not address this, but there were only three of the appellants who raised these claims in their administrative EEO complaints and therefore exhausted their administrative remedies on those claims. Of those three individual appellants, their own testimony, which we've cited in our brief, establishes that they were reasonably accommodated both before and after the decentralization. Mr. Kong, for example, testified that he had a back injury in 1981, that his doctor provided certain restrictions on that activity, and that those restrictions were honored both before the decentralization and after the decentralization. Similar with Mr. Spector, he had a back injury in 1983. He testified about the specific accommodations that he required to perform his job before and after the decentralization. Each of these three, Mr. Kong, Mr. Spector, and Ms. Thomas, admitted that whatever restrictions they had were honored. They did submit, at least Mr. Spector, and I believe Ms. Thomas did submit these declarations late in the game, to the extent that these declarations contradict their earlier testimony at their depositions. We would submit, Your Honors, that this is just a sham declaration meant to create an issue of fact. The questions in their testimony at their deposition were very specific regarding the accommodations that they required and what they were provided with. I would like, if I may, Your Honors, to make a couple of comments regarding these late declarations that were submitted. There were a few arguments that were raised in the reply brief for the first time that we believe require some clarification. First, appellants argue that Rule 56 allows the filing of declarations up to a day before the hearing, and that we agree with that. That's the way the rule reads. However, the appellants attempted to file these declarations a month after the hearing. The hearing on the summer judgment motion was set for February 12, 2002, and that's reflected in number 67 on the docket sheet, which appears at the supplemental excerpts at page 613. The appellants made applications to file their additional declarations on March 11, 2002, a month later, and that appears as numbers 93 through 98 of the docket sheet. The supplementary excerpts, pages 615 to 616. Appellants also argue that we were responsible somehow for shortening their time to oppose the motion for summer judgment, and that's not the case. The local rules provide for 35 days' notice. Under the case management order that was existing at the time, we had a dispositive motion hearing cutoff of February 12, 2002. We had to get our motion filed 35 days in advance of that date, and that was January 8. That's when we filed our motion. Now, after we filed our motion, the court advised us that that hearing date was no longer available, and they wanted us to re-notice the hearing date, which we did for April 9. But the trial date was set for April 8, so we wanted the court to address our motion before the trial date, so we made an application to expedite the hearing date back to the original February 12. The appellants still had the 35 days that is provided under local rules. One other point on the late declarations, appellants argued that we waived our evidentiary objections to the untimely declarations. That's not the case. When we opposed the application to file the late declarations, we specifically reserved our right to assert evidentiary objections, and that appears at page 604 of the supplementary excerpts. Unless Your Honors have any further questions, we would rely on our briefs to the remaining  Thank you, counsel. I don't think we have any further questions. And since your time is up, we have no further questions. We appreciate the argument made by both counsel, and the matter just argued will be submitted. Court will stand in recess. Thank you, counsel. Thank you, counsel. Thank you, counsel. Thank you. Thank you.
judges: Rymer, Hawkins, Bybee